UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

DARRELL W.[1],                            )
                                          )
        Plaintiff,                        )
                                          )
    v.                                    )        CIVIL NO.  2:20cv02
                                          )
ANDREW SAUL,                              )
Commissioner of Social Security,          )
                                          )
        Defendant.                        )

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for  Disability

Insurance Benefits (DIB) and Supplemental Security Income (SSI), as provided for in the Social

Security Act. 42 U.S.C. § 423(a), § 1382c(a)(3).  Section 405(g) of the Act provides, inter alia,

"[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the

record including the evidence upon which the findings and decision complained of are based.

The court shall have the power to enter, upon the pleadings and transcript of the record, a

judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without

remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to

any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to last for a continuous period of not less

than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

---

[1]  To protect privacy, Plaintiff's full name will not be used in this Order.

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §423(d)(3).  It is not enough for a plaintiff to establish that an impairment exists.  It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity.  *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff.  *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings. *Scott v. Astrue*, 734, 739 (7th Cir. 2011); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see also Bistek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019); *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).  "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2017.

2.      The claimant has not engaged in substantial gainful activity since August 1, 2015, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.      The claimant has the following severe impairments: degenerative disc disease of the lumbar and cervical spine with stenosis, sensory neuropathy of the upper extremities, epilepsy, headaches, status-post gunshot wound to the abdomen, obesity, depression, and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to [perform] light work as defined in 20 CFR 404.156(b) and 416.967(b) except: occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasional[ly] balance, stoop, kneel, crouch, and crawl; frequent use of the bilateral upper extremities to reach, handle, finger, and feel; can tolerate occasional exposure to extreme heat and cold, humidity, wetness, fumes, odors, dusts, gases, poor ventilation and hazards (such as dangerous moving machinery); can tolerate occasional exposure to loud noise as defined in the Selective Characteristics of Occupations (SCO); can perform simple tasks, make simple work related decisions; deal with occasional changes in work processes and environment; can have occasional contact with co-workers, supervisors, and general public; no work with the general public (20 CFR 404.1567(b) and 416.967(b)).

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on December 31, 1970 and was 44 years old, which is defined as a younger individual age 18-49,on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

3

11.     The claimant has not been under a disability, as defined in the Social Security
Act, from August 1, 2015, through the date of this decision (20 CFR 404.1520(g)
and 416.920(g)).

(Tr.  12 - 25).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability

benefits. The ALJ's decision became the final agency decision when the Appeals Council denied

review.  This appeal followed.

Plaintiff filed his opening brief on November 16, 2020.  On January 22, 2021, the

defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff

replied on February 5, 2021. Upon full review of the record in this cause, this Court is of the

view that the ALJ's decision must be affirmed.

A five-step test has been established to determine whether a claimant is disabled.  *See*

*Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-

91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test

as follows:

> The following steps are addressed in order:  (1)  Is the claimant
> presently unemployed?  (2)  Is the claimant's impairment "severe"?
> (3)  Does the impairment meet or exceed one of a list of specific
> impairments?  (4)  Is the claimant unable to perform his or her
> former occupation?  (5)  Is the claimant unable to perform any other
> work within the economy?  An affirmative answer leads either to
> the next step or, on steps 3 and 5, to a finding that the claimant is
> disabled.  A negative answer at any point, other than step 3, stops
> the inquiry and leads to a determination that the claimant is not
> disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162

n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).  From the nature

of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff was 44 years old on the alleged onset date. (Tr. 270). He completed 11th grade. (Tr. 275). He has past relevant work as a water blaster. (Tr. 23, 352).

On May 17, 2016, Plaintiff was assessed by Patty Leahy, LCSW, at Regional Mental Health Center. (Tr. 424-427). Plaintiff complained that he was depressed sometimes and frequently angry. (Tr. 427). He had difficulty learning how to read. (Tr. 427). The learning disability caused anger and made simple tasks difficult, such as filling out a job application. (Tr. 427). Plaintiff experienced difficulty adjusting back into society after his release from prison and was sad that his mother passed away. (Tr. 427). Plaintiff reported sleep issues, decreased appetite, isolative behavior, problems with focus, and becoming so angry at times that he loses touch with what is going on around him. (Tr. 451). LCSW Leahy noted that Plaintiff appeared depressed, suspicious, and guarded; had irrational judgement/reason; and fair insight. (Tr. 431, 451). LCSW Leahy found moderate symptoms of depression; occasional impulsivity (anger management issues); severe stress exacerbated by the reading disorder and unemployment; severe financial stress stemming from no income or insurance; and severe insomnia. (Tr. 444-445).

On May 22, 2016, Plaintiff was treated at the emergency department for a headache which had started three days prior and caused blurry vision. (Tr. 373-382). Plaintiff reported that his pain was 10/10 upon arrival at the ER. (Tr. 389). Plaintiff was prescribed Tramadol. (Tr. 373).

On May 31, 2016, Plaintiff treated with Stanley Ladowicz, LCSW, for frustration and anger due to difficulty with reading. (Tr. 470). Plaintiff stated that he was having a harder time returning to society this time due to his back issues, headaches, depression, and panic attacks.

5

(Tr. 470). LCSW Ladowicz was concerned that Plaintiff may re-offend if not treated. (Tr. 470).

On July 5, 2016, Plaintiff followed up with LCSW Ladowicz. (Tr. 472). Plaintiff had remained hypervigilant since being in prison and could not relax. (Tr. 472). Plaintiff appreciated the session and reported that he wanted to talk more. (Tr. 472).

On July 20, 2016, Plaintiff presented to Daksha Vyas, M.D., with a history of seizures. (Tr. 475-491). Plaintiff experienced migraines and right leg numbness which incapacitates him until the pain passes. (Tr. 487). Plaintiff further stated that he experienced panic attacks which felt like heart attacks. (Tr. 487). Dr. Vyas noted tenderness in the lumbar paraspinal muscles. (Tr. 490). He assessed migraine with aura and diagnosed chronic L4-L5 radicular pain; seizure disorder; psychiatric history; patient under care of psychiatrist; status post-gunshot wound to the abdomen; and status post-laparotomy. (Tr. 491).

On August 1, 2016, Plaintiff treated with LCSW Ladowicz regarding reducing frustration and staying problem-focused. (Tr. 639). Two weeks later, Plaintiff returned for depression. (Tr. 640). Plaintiff reported that he did not care about anything at times; was unable to sleep at night; had a decreased appetite; was isolative; and had problems with focus/concentration. (Tr. 640). His situation was worsening: he needed to find housing; was worried about losing custody; and was frustrated by the paperwork involved with these issues due to his learning disability. (Tr. 640).

On August 27, 2016, Plaintiff was seen at Methodist Hospital after a motorcycle accident. (Tr. 581-592). Plaintiff presented with a laceration between his left ring and index finger, had pain in his great toe, and abrasions on the left thigh and lower left leg. (Tr. 582).

On August 30, 2016, Plaintiff returned to LCSW Ladowicz for depression. (Tr. 641).

Plaintiff was living in his car and was having difficulty sleeping. (Tr. 641). Plaintiff's son was

living with relatives. (Tr. 641). LCSW Ladowicz noted that Plaintiff had a history of poor

judgement when nothing seemed to be working. (Tr. 641).

On September 27, 2016, Plaintiff underwent a mental health risk assessment. (Tr. 629).

Plaintiff exhibited moderate symptoms of depression; he was frustrated that he was homeless and

had severe anxiety due to the situation and stress of having to take care of his son. (Tr. 629).

Plaintiff had occasional anger management issues; moderate feelings of hopelessness; severe

stress; severe employment/education stress; poor physical condition; severe financial stress;

isolated living arrangements; severe insomnia; and a limited support system. (Tr. 629-630). He

reported that he did not care about anything at times; could not sleep at night; was isolative; had

problems with focus/concentration; and had a decreased appetite. (Tr. 645).

On October 10, 2016, Plaintiff saw LCSW Ladowicz for depression. (Tr. 651). Plaintiff

reported a reduction in frustration, depression, and thoughts of violence and suicide. (Tr. 651).

On October 19, 2016, Plaintiff returned to Dr. Vyas regarding seizures that happened

while he slept. (Tr. 505). Plaintiff reported being in the hospital recently for a seizure and that he

had been prescribed Keppra 500 mg, two times a day. (Tr. 505). Plaintiff also complained of

bilateral arm pain, weakness, tingling, and headaches that occurred every three days. (Tr. 505,

530). Dr. Vyas diagnosed Plaintiff with chronic L4-L5 radicular pain, seizure disorder, left arm

paresthesia, seizure disorder- grand mal type, and chronic migraine headaches. (Tr. 505).

On December 30, 2016, Plaintiff treated with Dr. Vyas for a bad headache. (Tr. 505). He

also complained of left arm pain and numbness that started while he slept and woke him up. (Tr.

505). Dr. Vyas diagnosed migraine with aura, sensory neuropathy, ulnar neuropathy, and chronic

7

lower back pain. (Tr. 505, 521-522). Dr. Vyas prescribed Mobic and lidocaine ointment. (Tr. 505).

On March 31, 2017, Plaintiff saw Dr. Vyas at a follow up appointment. (Tr. 505). Plaintiff stated his headaches were not as bad as before, but that he may have had a seizure where he blacked out. (Tr. 508). Plaintiff also complained of right side back pain. (Tr. 508). Dr. Vyas noted tenderness in the lumbar paraspinal muscles. (Tr. 512). Dr. Vyas diagnosed acute exacerbation of low back pain with L4-L5 radicular pain, recurrent seizure disorder, chronic daily migraine headaches, chronic gait disturbance. (Tr. 505). She ordered Plaintiff to resume Mobic for a month, increased Keppra to 1,000 mg twice daily, and continued the rest of his medications. (Tr. 505).

On July 7, 2017, Plaintiff returned to Dr. Vyas for a follow up. (Tr. 500). Dr. Vyas ordered CBC with differential, POCT occult blood stool, and referred him to gastroenterology. (Tr. 506).

On August 2, 2017, Plaintiff was seen at the St. Mary Emergency Department. (Tr. 539-552). Plaintiff was diagnosed with chest pain, seizure, and elevated creatine kinase. (Tr. 539). Plaintiff was referred to neurology, cardiology, and gastroenterology. (Tr. 549).

On September 22, 2017, Plaintiff treated with Dr. Vyas after his visit to St. Mary Hospital. (Tr. 561, 672). Plaintiff complained of chest pain, which he rated a 6/10, and chronic back spasms. (Tr. 672). Plaintiff had tenderness in the lumbar paraspinal muscles and negative straight leg raises. (Tr. 564). Dr. Vyas diagnosed: chronic lumbar radiculopathy, recurrent seizure disorder, chronic gait disturbance, and sensory peripheral neuropathy. (Tr. 672). Plaintiff was to continue taking Keppra and start gabapentin. (Tr. 673).

8

On January 19, 2018, Plaintiff saw Erica Ketchum, FNP, for complaints of constant, chronic back pain. (Tr. 674). Plaintiff stated that the pain was stabbing, aching, and radiated to the right thigh. (Tr. 674). Plaintiff rated his pain as a 6/10 and stated that it was aggravated by bending, twisting, and certain positions. (Tr. 674). Plaintiff also experienced numbness, leg pain, and weakness. (Tr. 674). Plaintiff had nerve damage from an old gunshot wound which caused the numbness in his leg. FNP Ketchum noted tenderness in the lumbar back. (Tr. 675).

On April 20, 2018, Plaintiff followed up with FNP Ketchum for complaints of burning back pain and dizziness when he stood up. (Tr. 678). Plaintiff described the sensation of pins and needles in his leg and chest pain. (Tr. 678). Findings were positive for arthralgias, back pain, myalgias, seizures, weakness, and numbness. (Tr. 678-679). FNP Ketchum noted that the right quadriceps strength was only a 3/5 and that Plaintiff had abnormal tandem walking coordination. (Tr. 681-682). There was tenderness in the lumbar back. (Tr. 683). FNP Ketchum referred Plaintiff to physical therapy for TENS treatment and discussed looking into removing the bullet. (Tr. 684).

Plaintiff was admitted to the hospital from May 5-8, 2018. (Tr. 569-580). Plaintiff presented with acute exacerbation of his chronic back pain and reported having saddle anesthesia. (Tr. 598). Plaintiff reported using a cane to ambulate due to a loss of balance; he had weakness in his legs and sometimes felt like they were going to give out. (Tr. 604, 612). Plaintiff exhibited tenderness to palpation in the lumbar region and complained of shooting pain in his left, lower back. (Tr. 594, 598). An x-ray of the lumbar spine revealed degenerative changes from L4-S1. (Tr. 597). A CT of the lumbar spine showed a large disc herniation on the left at L4-L5; advanced disc height loss and degeneration at L4-L5; and a pseudoarthrosis on the left side with sclerosis.

9

(Tr. 597). A myelogram showed spinal stenosis. (Tr. 602). Plaintiff's final diagnoses included intervertebral disc disorders with radiculopathy in the lumbar region; spinal stenosis in the lumbar region without neurogenic claudication; other abnormalities of gait and mobility; pelvic and perineal pain; paresthesia of skin; and epilepsy. (Tr. 593).

On May 17, 2018, Plaintiff followed up with FNP Ketchum. (Tr. 685). FNP Ketchum noted Plaintiff's right quadriceps strength as 3/5; abnormal tandem walking coordination; tenderness in the lumbar paraspinal muscles; and negative straight leg raises. (Tr. 688-689). The encounter diagnoses included gait disturbance, chronic midline low back pain without sciatica, chronic lumbar radiculopathy, grand mal seizure, tenderness of the back, back spasms, and sensory neuropathy. (Tr. 690). FNP Ketchum prescribed Norco to be taken three times a day. (Tr. 691).

On June 12, 2018, Plaintiff treated with Dr. Shukairy for numbness and chronic back pain that radiated down his right leg. (Tr. 718). Plaintiff stated that the pain had not improved and rated

it a 6/10. (Tr. 718, 720). Dr. Shukairy noted pain with lumbar flexion and extension at 20 degrees and pain with straight leg raises on the left at 30 degrees. (Tr. 721). He further noted mild left dorsiflexion weakness of 4/5 and decreased sensation and paresthesia of the left calf. (Tr. 722). He diagnosed lumbar disc disease with radiculopathy. (Tr. 718).

On July 10, 2018, Plaintiff saw Dr. Shukairy for worsening back pain, which he rated as a 7/10. (Tr. 724-727). Plaintiff had low back pain which radiated into the right leg and caused trouble walking. (Tr. 727). There was an increased onset of neck pain which shot down into the mid and lower spine and worsened with flexion; numbness in both upper arms; difficulty with the

use of his right hand; right grip strength of 4/5; decreased sensation to light touch over the left and right medial forearms; mild dorsiflexion weakness 4 to 4+ bilaterally; and positive straight leg raise on the right. (Tr. 727). Dr. Shukairy was concerned about further spinal stenosis. (Tr. 727).

On July 12, 2018, Plaintiff was seen by Megan Castle, MA. (Tr. 622-628). Plaintiff reported an increase in depressive symptoms during the last month. (Tr. 637). Plaintiff's son was not at home and Plaintiff had gotten into an altercation with his brother. (Tr. 637). Plaintiff reported isolation; a lack of appetite which had caused a 20-pound weight loss; anhendonia; irritability; difficulty falling back to sleep; and rumination. (Tr. 637). Plaintiff presented with anxious distress caused by constant worry, restlessness, trouble concentrating, and a fear of losing control. (Tr. 637). Plaintiff was naturally isolative and avoided crowds. (Tr. 637). He was diagnosed with active major depressive disorder (recurrent episode with moderate anxious distress). (Tr. 627).

On July 18, 2018, Plaintiff treated with LCSW Ladowicz. (Tr. 713). Plaintiff reported that he recently found himself angry and depressed. (Tr. 713). Plaintiff realized that he was easily angered and did not want to blow up. (Tr. 713). LCSW Ladowicz noted that Plaintiff had difficulty being in public since he was released from jail. He further noted that Plaintiff was isolated and depressed. (Tr. 713). That same day, Plaintiff underwent a thoracic and cervical CT scan. (Tr. 692). The thoracic CT revealed mild dorsal spondylosis. (Tr. 692). The cervical CT showed cervical spondylosis which was more pronounced at C5-C6 and C6-C7. (Tr. 692).

On July 25, 2018, Plaintiff received a right greater occipital nerve block and trigger point injection in the cervical and lumbar regions. (Tr. 692, 699). Dr. Vyas refilled Plaintiff's Norco

prescription with orders to take one 325 mg tablet three times daily. (Tr. 702).

On August 8, 2018, Plaintiff visited LCSW Ladowicz. (Tr. 705-709). During counseling, Plaintiff revealed a fear that he would lose control and end up back in prison. (Tr. 714). Plaintiff had experienced family conflict at his aunt's wedding, and LCSW Ladowicz reinforced non-violent ways to manage situations. (Tr. 714). LCSW Ladowicz noted that Plaintiff had a close, but conflicted, family relationship and that anger and trust issues kept him from making progress in life. (Tr. 706, 709). LCSW Ladowicz diagnosed recurrent major depressive disorder. (Tr. 705).

On August 22, 2018, Plaintiff returned to LCSW Ladowicz for counseling. (Tr. 715). Plaintiff reported less depression now that his son had returned home, but was still isolative. (Tr. 715). Plaintiff was still reluctant to interact with others, even his family at times. (Tr. 715).

On August 23, 2018, Plaintiff followed up with Dr. Shukairy. (Tr. 730). Plaintiff had not experienced any change since the first injection. (Tr. 730). Dr. Shukairy reviewed CT results and noted a disc bulging and disc osteophyte complex causing right-sided neural foraminal stenosis at C6-C7 and cervical spondylosis at C5-C6. (Tr. 732). Plaintiff was scheduled for a second injection to occur on August 29, 2018. (Tr. 730).

At the hearing before the ALJ, Plaintiff testified to the following: He previously worked as a laborer doing water blasting which required him to carry hoses that were approximately 100 pounds; he was unable to perform that job after 2011. (Tr. 64-66). His back pain is caused by the bullet in his back; the pain started in 2015 after he injured his back when picking something up. (Tr. 68). His employer laid him off because he was no longer able to perform the job. (Tr. 68). He experiences numbness in his left leg and has trouble gripping due to nerve pain in his arm. (Tr.

12

68). His pain has been constant for the last year and a half. (Tr. 69). A doctor discussed surgery, but gave him a 90% chance of paralysis. (Tr. 69).

Plaintiff was attending physical therapy, but could not completely bend down because of the shooting pain. (Tr. 70). At his most recent appointment, he had to stop the exercise due to the pain. (Tr. 70). He has not been able to lift or walk very far because his leg gives out. (Tr. 70). He is able to walk for 15 minutes before having to rest on his cane for eight to ten minutes. (Tr. 71). He uses his cane regularly, as Dr. Vyas ordered, because his balance is off while standing. (Tr. 72). He uses the cane every day and only walks five or six feet without it. (Tr. 73).

He tried injections for his back, but it only caused an increase in his pain. (Tr. 73-74). He experiences numbness in his left leg and both hands. (Tr. 74). The numbness in his hands comes and goes, usually for an hour at a time, and normally is present two or three days a week. (Tr. 75). When the pain gets too bad, he takes "headache pills", that he thought may be Percocet. (Tr. 75-76). He takes these pills three times a day, and they make him fall asleep every time he takes them. (Tr. 75-76). His fingers stiffen up every time he tries to carry something and he sometimes drops things that don't have handles. (Tr. 76-77).

He is not computer literate. (Tr. 77). He did not graduate high school. (Tr. 78).  He was in special education classes since the first grade. (Tr. 82).  His reading is very limited and his sister fills out most of his job applications because he is unable to comprehend what the form is asking for. (Tr. 83). When he had a job, his employer would have to explain what to do and he would mess up half the time. (Tr. 83).

He was in prison from 1992-2005 and then again between approximately 2012-2014.(Tr. 78-81). He went to the hospital for his most recent seizure in June 2018 and is now on medication. (Tr. 82). He takes the seizure medication three times a day, but sometimes has to be

reminded to take it. (Tr. 82).

He attempted suicide when his stepfather passed away and later shot himself in the hand. (Tr. 85). His last treatment for depression was in 2017; he would have continued, but his psychiatrist moved out of state. (Tr. 85). He largely stays home and avoids being around "a lot of people." (Tr. 86). He had verbal altercations with two of his supervisors. (Tr. 87).

The Vocational Expert ("VE") testified that Plaintiff's past work as a water blaster was performed at a heavy physical exertion level. (Tr. 87). The VE further testified that an individual with the Plaintiff's RFC would be capable of working as a production inspector, packer, and assembler at a light exertional level, and as a bench worker, bonder, and assembler at a sedentary exertional level. (Tr. 88-90).

In support of remand, Plaintiff first argues that the mental RFC is not supported by substantial evidence.  Pursuant to Social Security Ruling ("SSR") 96-8p, an "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p. Additionally, an RFC "does not represent the least an individual can do despite his or her limitations or restrictions, but the most." SSR 96-8p; *see also* 20 C.F.R. § 404.1545(a)(1), 416.945(a)(1) (residual functional capacity is the most someone can do despite their mental and physical limitations). In order to determine an RFC, the adjudicator is instructed to base the assessment on "all of the relevant medical and other evidence." 20 C.F.R § 404.1545(a)(3), 416.945(a)(3). Here, the ALJ determined Plaintiff has the RFC to perform light work as defined in 20 CFR 404.1567(a) and 416.967(a) with some qualifications including "can perform simple tasks, make simple work related decisions; deal with occasional changes in work processes and environment;

14

can have occasional contact with coworkers, supervisors, and general public; no work with the general public." (Tr. 17).

Plaintiff contends that the mental RFC is not supported by substantial evidence because the ALJ failed to properly weigh the opinion of treating therapist, LCSW Ladowicz. LCSW Ladowicz opined that Plaintiff was unable to meet the following competitive standards for unskilled work: maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and deal with normal work stress. (Tr. 738). He further opined that Plaintiff was unable to meet competitive standards when it came to interacting appropriately with the general public, maintaining socially appropriate behavior, and using public transportation. (Tr. 739). LCSW Ladowicz expected Plaintiff to be absent from work about three days per month due to his impairments or treatments. (Tr. 740).

The ALJ granted this opinion little weight, noting that LCSW Ladowicz provided a Global Assessment Function score even though the Plaintiff "has only recently returned to treatment and was not yet assessed by any psychiatrist".  The ALJ further opined that the alleged inability to read was inconsistent with the Plaintiff's testimony and notes from Plaintiff's neurologist. The ALJ objected to LCSW Ladowicz providing a limitation based on a history of concussion and seizures, because LCSW Ladowicz was not qualified to opine on medical restrictions. (Tr. 21). The ALJ further noted that Plaintiff's mental treatment was sporadic and that Plaintiff did volunteer work as well as helped enroll his son in school. (Tr. 21).

In determining disability, the Agency will always consider the medical opinions of record together with the rest of the relevant evidence. 20 C.F.R. § 404.1527(b), 416.927(b). SSA

15

regulations articulate the rules for weighing opinion evidence from treating sources:

> Generally, we give more weight to the opinions from your treating sources, since
> these sources are likely to be the medical professionals most able to provide a
> detailed, longitudinal picture of your medical impairment(s) and may bring a
> unique perspective to the medical evidence that cannot be obtained from the
> objective medical findings alone or from reports of individual examinations.

20 C.F.R. § 404.1527(c)(2), 416.927(c)(2). SSR 06-3p requires the ALJ to evaluate the opinions

of non-acceptable medical sources by looking at how long the source has known and how

frequently the source has seen the individual; how consistent the opinion is with other evidence;

the degree to which the source presents relevant evidence to support an opinion; how well the

source explains the opinion; whether the source has a specialty or area of expertise related to the

individual's impairment; and any other factors that tend to support the opinion. The ruling goes

on to say that:

> With the growth of managed health care in recent years and the emphasis on
> containing medical costs, medical sources who are not "acceptable medical
> sources," such as licensed clinical social workers] . . . have increasingly assumed a
> greater percentage of the treatment and evaluation functions handled primarily by
> physicians and psychologists. Opinions from these medical sources who are not
> technically deemed "acceptable medical sources," under our rules, are important
> and should be evaluated on key issues such as impairment severity and functional
> effects, along with the other evidence in the file.

*Id*. Plaintiff argues that LCSW Ladowicz' opinion is supported by his therapy notes in which he

documented that Plaintiff exhibited hypervigilance (Tr. 472); difficulty returning to society (Tr.

470, 713); frustration and anger due to his learning disability (Tr. 470, 640); problems with

focus/concentration (Tr. 640); poor judgement when frustrated (Tr. 641); not caring about

anything (Tr. 641, 640); isolative behavior (Tr. 640, 713-715); concerns about blowing up (Tr.

713-714); and depression (Tr. 713, 641, 651, 640, 715).

Plaintiff further argues that LCSW Ladowicz' findings are consistent with other portions

of the record. LCSW Leahy noted depression, anger, frustration caused by his reading disorder, difficulty adjusting back to society, irrational judgement/reason, impulsivity/anger control issues, a history of suicide attempts and violence, isolative behaviors, problems with focus/concentration, and reports of not caring about anything. (Tr. 427, 430-431, 444, 446-447, 451). LCSW Leahy diagnosed Plaintiff with personality disorder, major depressive disorder (recurrent), and panic disorder. (Tr. 453). Plaintiff also contends that the ALJ erroneously placed heavy reliance on activities of daily living as a basis to discount LCSW Ladowicz' opinion.

In response, the Commissioner points out that the ALJ explained that she gave "great weight" to the findings of the State agency psychological consultants who evaluated Plaintiff's claims at the initial and reconsideration levels of review (Tr. 22). *See* 20 C.F.R. §§ 404.1513a (b)(1), 416.913a(b)(1) (providing that ALJs are not required to adopt any prior administrative medical findings, but they must consider them because State agency medical and psychological consultants "are highly qualified and experts in Social Security disability evaluation"). The ALJ explained that, consistent with the evidence of record, the psychological consultants opined that Plaintiff could understand, remember, and carry out unskilled tasks; could relate, on a superficial basis, with coworkers and supervisors; could attend to tasks for sufficient periods to complete them; and could manage the stresses involved with work (Tr. 22).

As discussed above, in challenging the ALJ's mental RFC finding, Plaintiff alleges that the ALJ improperly evaluated an opinion from Mr. Ladowicz, whom Plaintiff saw in therapy. Mr. Ladowicz completed a form opinion about Plaintiff's mental capacities and limitations in September 2018 (Tr. 736–41). Mr. Ladowicz opined, *inter alia*, that Plaintiff could not meet competitive standards with respect to sustaining an ordinary routine without special supervision; maintaining socially appropriate behavior; and maintaining regular attendance and being punctual

within customary, usually strict, tolerances (Tr. 738–39). Mr. Ladowicz further noted, "Between low frustration tolerance, inability to read, and anxiety/suspiciousness, [Plaintiff] may have difficulty functioning in a work environment" (Tr. 740).

The regulations set forth several factors that an ALJ considers when weighing a medical opinion from an acceptable medical source. 20 C.F.R. §§ 404.1527(c), 416.927(c). The same factors apply when an ALJ considers an opinion from a source who does not qualify as an acceptable medical source, such as Mr. Ladowicz, a social worker, although not every factor applies in every case. 20 C.F.R. §§ 404.1527(f)(1), 416.927(f)(1). When an opinion from a source who does not qualify as an acceptable medical source may affect the outcome of the case, the adjudicator generally should explain in his or her decision the weight given to the opinion, or otherwise ensure that his or her discussion of the evidence allows a subsequent reviewer to follow his or her reasoning. 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2).

As the Commissioner points out, in the present case the ALJ considered the relevant regulatory factors when she evaluated Mr. Ladowicz's opinion, and provided multiple reasons for discounting the opinion (Tr. 21). The ALJ explained that while Mr. Ladowicz stated that Plaintiff could not read (Tr. 740), such statement is inconsistent with Plaintiff's neurological treatment notes, which show that Plaintiff was fully able to read and write (Tr. 21; *see* Tr. 660). The ALJ also explained that Mr. Ladowicz assessed limitations based on a history of concussion and seizures, but, as a social worker, was not qualified to evaluate physical impairments (Tr. 21). The Commissioner acknowledges that Mr. Ladowicz indicated that Plaintiff had "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities" (Tr. 737). However, in offering this opinion, Mr. Ladowicz explained that

18

Plaintiff had "history of concussion/history of seizure" (Tr. 737). The ALJ further explained that

while Mr. Ladowicz opined that Plaintiff's current Global Assessment of Functioning (GAF)

score was 40, and that Plaintiff's highest GAF score during the past year was 48, Plaintiff had

only recently returned to treatment and had not yet seen a psychiatrist (Tr. 21). Lastly, the ALJ

reiterated that while some of Plaintiff's treatment notes reflect social phobias, such notes also

show that Plaintiff was able to perform volunteer work and also was able to help enroll his son in

school (Tr. 21).

Plaintiff alleges that certain reasons the ALJ gave for discounting the opinion, standing

alone, were insufficient. However, the ALJ did not discount Mr. Ladowicz's opinion for one

reason alone. Rather, the ALJ identified multiple reasons that, taken together, supported giving

the opinion "little weight" (Tr. 21). As noted, Plaintiff alleges that the treatment notes support

Mr. Ladowicz's opinion in that the treatment notes show difficulty returning to society from

prison, hypervigilance, frustration and anger about his learning disability, and a history of suicide

attempts and violence. However, Plaintiff does not explain how such treatment notes support the

work-preclusive limitations that Mr. Ladowicz identified. Moreover, while Plaintiff alleges that

the ALJ "erroneously placed heavy reliance on activities of daily living as a basis to discount

[Mr.] Ladowicz's opinion," the record shows that the ALJ, in fact, considered Plaintiff's

activities as only one factor among several when she considered the opinion (Tr. 21).

Plaintiff also alleges that the gap in his mental health treatment was due to his therapist

relocating temporarily. However, as the ALJ noted earlier in her decision, the record reflects that

staff at Regional Mental Health attempted to contact Plaintiff several times between late 2016

and early 2017, but Plaintiff did not respond (Tr. 20; see Tr. 656–58).  Nevertheless, the record

makes clear that the ALJ was aware that Plaintiff participated in therapy for approximately six

19

months during 2016 and did not return to treatment for nearly two years (Tr. 20). Moreover, the

ALJ included appropriate work-related limitations in the mental RFC finding and adequately

explained the basis for the RFC finding as well as her rationale for discounting Mr. Ladowicz's

opinion.

In light of the above, this Court finds that substantial evidence supports the ALJ's mental

RFC analysis.

Next, Plaintiff argues that the ALJ's physical RFC determination is not supported by

substantial evidence. The ALJ found that Plaintiff had the following severe physical

impairments: degenerative disc disease of the lumbar and cervical spine with stenosis, sensory

neuropathy of the upper extremities, epilepsy, headaches, status-post gunshot wound to the

abdomen, and obesity. (Tr. 12). The ALJ accounted for these severe physical impairments in the

physical RFC by making a finding of light work with the limitation that Plaintiff could only:

> [O]ccasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds;
> occasional[ly] balance, stoop, kneel, crouch, and crawl; frequent use of the
> bilateral upper extremities to reach, handle, finger, and feel; can tolerate
> occasional exposure to extreme heat and cold, humidity, wetness, fumes, odors,
> dusts, gases, poor ventilation and hazards(such as dangerous moving machinery);
> can tolerate occasional exposure to loud noise as defined in the Selective
> Characteristics of Occupation (SCO)

 (Tr. 17).

Plaintiff alleges that the ALJ "repeatedly mischaracterizes the evidence in order to

downplay the severity of [his] condition".  However, Plaintiff's allegation lacks merit. As one

example of a mischaracterization by the ALJ, Plaintiff alleges:

> When noting an ER visit after a motorcycle accident, the ALJ stated that 'instead
> of complaining of . . . grand mal seizure . . . the claimant was treated for a finger
> splint and laceration repair. Of note, the final diagnosis included "unspecified
> convulsions" and less than two months later, Plaintiff informed Dr. Vyas that he

had recently been in the hospital for a seizure and had a prescription for Keppra. (Plaintiff's Brief at 19, citing Tr. 18, 505, 581). Contrary to Plaintiff's allegation, the ALJ made no mischaracterization in discussing Plaintiff's hospital treatment stemming from a motorcycle accident. Consistent with the ALJ's statement, the record reflects that when Plaintiff received emergency room treatment for a motorcycle accident in August 2016, he did not complain of any current seizure activity. Rather, Plaintiff reported that he crashed while trying to avoid a piece of glass, ultimately suffering road rash, a laceration to his hand, and toe pain (Tr. 586). As the ALJ noted, Plaintiff received treatment for the laceration on his hand and was discharged home (Tr. 18, 589–92). To the extent that Plaintiff's final diagnoses included "unspecified convulsions," the record shows that Plaintiff apparently told emergency room personnel that his "past medical history" included seizures (Tr. 581). The record further shows  that, approximately two months later, Plaintiff told Dr. Vyas that he had been hospitalized for seizures (Tr. 505); however, Plaintiff has identified no supporting hospital records.

Plaintiff alleges that the ALJ mischaracterized other emergency room notes, dated August 2, 2017, by determining that he received treatment for mere dehydration based on a discharge note that instructed him to "drink lots of water". To the contrary, in discussing Plaintiff's emergency room notes from August 2, 2017, the ALJ explained that it appeared as though Plaintiff was dehydrated, given that he was instructed to "drink lots of water" upon discharge (Tr. 19; *see* Tr. 539). The ALJ recognized, however, that Plaintiff underwent a series of tests while at the hospital (including full blood work, an EKG, and x-rays of his chest and lumbar spine), had clear signs of elevated creatine kinase, and was also instructed "do not drive" (Tr. 19; *see* Tr. 539). Thus, the ALJ did not mischaracterize Plaintiff's emergency room notes dated August 2, 2017.

21

Plaintiff also alleges that the ALJ mischaracterized a June 2018 treatment note as reflecting that he had a normal gait. Plaintiff notes that his "musculoskeletal system was positive for a gait problem". The record shows that when Plaintiff presented for treatment in June 2018, he subjectively reported a "gait problem" (Tr. 721); however, on physical examination, Plaintiff's gait was "normal without ataxia" (Tr. 722). Thus, here again, the ALJ made no mischaracterization.

Plaintiff further alleges that the ALJ erred by stating that he had normal grip strength on July 10, 2018. To the contrary, the ALJ stated that, in the RFC finding, she limited Plaintiff to no more than frequent manipulative tasks based on Plaintiff's July 10, 2018 treatment note, despite evidence showing that Plaintiff had normal grip strength (Tr. 18; *see* Tr. 364, 727). Later in her decision, the ALJ specifically noted that when Plaintiff presented for treatment on July 10, 2018, he had full motor strength in his upper extremities, but his right grip strength was 4+ out of 5 (Tr. 20; *see* Tr. 727).

Plaintiff also alleges that the ALJ mischaracterized the evidence by stating that he had full muscle strength, whereas the record shows that he had decreased strength in his right quadriceps. Plaintiff does not mention, however, that his treating source tested his muscle strength in 34 areas, and found full strength in 33 areas (*see, e.g.*, Tr. 488–89, 502, 510, 527, 563, 662). Even assuming, *arguendo*, that the ALJ mischaracterized the evidence by stating that Plaintiff had full muscle strength, Plaintiff has failed to show harm stemming from such error. That is, Plaintiff has failed to show that his decreased strength in one out of 34 areas tested warranted greater work-related limitations in the RFC finding.

Plaintiff also alleges that the ALJ mischaracterized the evidence by stating that he stopped working because he was terminated from his job, not because of any disability. However, the

ALJ made no mischaracterization in this regard. The record plainly reflects that when Plaintiff

applied for DIB and SSI, he reported that he stopped working "because of other reasons" and

explained that he was "terminated" (Tr. 274).

      Plaintiff further alleges, "[T]he ALJ regularly added in adjectives designed to diminish a

medical finding, when the medical notes do not put any such limitation on the finding"

(Plaintiff's Brief at 21). Plaintiff alleges, for example, that the ALJ stated that he had "some pain

on rotating," whereas the record reflects that he had "pain with lumbar flexion". The

Commissioner contends that Plaintiff has shown no error by the ALJ in this regard because it is

unclear how the ALJ's use of the word "some" was calculated to diminish the relevant medical

finding.

      As another example, Plaintiff alleges that the ALJ stated that he had "minimal lower back

discomfort on palpation," whereas the record shows that Dr. Vyas noted "Tenderness +++ in the

lumbar paraspinal muscles" (Plaintiff's Brief at 21, citing Tr. 16, 19, 663). Notably though, the

same treatment note from Dr. Vyas reflects that Plaintiff was in no distress, had negative straight

leg raising, and exhibited "no tenderness" on musculoskeletal examination (Tr. 663–64). Thus,

even assuming that the ALJ erred by describing Plaintiff's discomfort as "minimal," such error

was harmless when viewed in context, particularly considering Dr. Vyas's subsequent statement

that Plaintiff had no tenderness on musculoskeletal examination (Tr. 664).

      To the extent that the ALJ erred by describing certain other physical examination findings

as "slight," the Commissioner contends that such error was harmless given the deferential

limitations set forth in the RFC finding, and considering that Plaintiff has failed to identify

greater work-related limitations that should have been included in the RFC finding. Moreover,

while the ALJ found that Plaintiff could perform a reduced range of light work, the ALJ went on

to find that Plaintiff was not disabled because he could perform representative light and sedentary jobs that existed in significant numbers in the national economy (Tr. 24).

Plaintiff also faults the ALJ for not mentioning Plaintiff's testimony that he took pain medication three times a day and fell asleep every time he took it. However, the ALJ found that Plaintiff's subjective complaints were not altogether consistent with the medical and other evidence of record (Tr. 21), a finding that Plaintiff has not specifically challenged. Moreover, Plaintiff does not identify any evidence that would support his testimony about medication side effects, such as a report of side effects to a medical source. And while Plaintiff alleges that he was "left to wonder" how the ALJ accommodated his headaches in the RFC finding, the ALJ explained that the RFC finding included reasonable limitations, considering that Plaintiff's headaches were well-controlled (Tr. 18; *see, e.g.*, Tr. 676). Plaintiff has not challenged the ALJ's statement that his headaches were well-controlled, let alone identified evidence showing that greater work-related limitations were warranted.

In his final challenge to the ALJ's physical RFC finding, Plaintiff suggests that the ALJ erred by not giving sufficient weight to medical opinions. However, the regulations make clear that an ALJ is responsible for assessing a claimant's RFC, 20 C.F.R. §§ 1546(c) and 416.946(c), and must do so "based on all the relevant evidence" in the record. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Accordingly, an ALJ need not adopt a particular medical opinion when formulating a claimant's RFC. *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a claimant's RFC is a matter for the ALJ alone — not a treating or examining doctor — to decide."); *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (In determining a claimant's RFC, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians."). Here, the record makes clear

that the ALJ carefully considered the totality of the evidence when formulating Plaintiff's physical RFC, and substantial evidence cited by the ALJ supports the ALJ's physical RFC finding.

Accordingly, the Decision to deny benefits will be affirmed.

Conclusion

On the basis of the foregoing, the Decision of the Commissioner is hereby AFFIRMED.

Entered: February 10, 2021.

s/ William C. Lee
William C. Lee, Judge
United States District Court